NOT FOR PUBLICATION

RECEIVED
JAN 22 2018
AT 8:30_____M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

THE CENTER FOR THE FUNCTIONAL
RESTORATION OF THE SPINE, LLC, *as
assignee and statutory derivative beneficiary
for Evangelia Minto*,

        Plaintiff,

v.

U.S. OFFICE OF PERSONNEL
MANAGEMENT,

        Defendant.

Civ. No. 16-7084

**OPINION**

---

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court upon the Motion for Summary Judgment by Defendant United States Office of Personnel Management ("Defendant" or "OPM") (ECF No. 22) and the Cross Motion for Summary Judgment by Plaintiffs Evangelia Minto and The Center for the Functional Restoration of the Spine, LLC ("the Center"), (collectively "Plaintiffs") (ECF No. 24). The Court has decided these Motions based upon the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78(b). For the reasons stated herein, Defendant's Motion for Summary Judgment is granted and Plaintiffs' Cross Motion is denied.

## BACKGROUND

This case arises out of a surgical procedure Mrs. Evangelia Minto had for a spinal injury, performed by doctors at the Center, and the subsequent refusal to cover the insurance claim for

1

said surgery by a federally-contracted insurance carrier. The relevant, undisputed facts are as follows: Mrs. Evangelia Minto was insured through her husband's health insurance plan with the National Association of Letter Carriers ("NALC") through Federal Employee Health Benefits ("FEHB"). (Def.'s Mot. Summ. J. at 1, ECF No. 22-1.) All FEHB carriers must provide services that OPM finds an individual is entitled to under the terms of his or her plan. (*Id.*); 5 U.S.C. § 8902(j). Mrs. Minto's plan contract through NALC ("the Plan") provided coverage for only "medically necessary" services, medications, and procedures. (R. at 0134–36 (citing brochure which purported to be a complete and official statement of medical benefits).)[1]

The Plan defines medical necessity as services or treatments that NALC determines:

> Are appropriate to diagnose or treat your condition, illness, or injury; [] Are consistent with standards of good medical practice in the United States; [] Are not primarily for the personal comfort or convenience of you, your family, or your provider; [] Are not related to your scholastic education or vocational training . . . .

(R. at 0139.) The Plan brochure expressly notes that medical necessity is not guaranteed by the fact that a medical provider has "proscribed, recommended, or approved" a particular course of treatment or service. (R. at 0140.) The terms of the Plan also provided NALC with the right to pursue independent medical review of an insurance claim to determine whether the particular treatment or procedure meets the standards and requirements of the Plan. (R. at 0138.)

In 2008, Mrs. Minto underwent her first back surgery performed by William K. Main, M.D. ("Dr. Main"), an undisputedly medically necessary procedure to fuse her C4–6 vertebrae. (R. at 0011.) Experiencing more pain, she returned to Dr. Main, who performed another medically necessary fusion procedure on January 31, 2013, designed to foster bone growth between the C6 and C7 vertebrae. (R. at 0011, 0058.) Mrs. Minto returned to Dr. Main on June

---

[1] All citations formatted as "R. at ___" refer to the OPM Administrative Record provided by Defendant, representing the complete record applicable in this case.

2

4, 2014, yet again experiencing pain. (R. at 0031.) Dr. Main believed she suffered from "probable pseudarthrosis," recommended an MRI, and advised she refrain from strenuous activity and follow up in due course to "discuss additional diagnostic or therapeutic considerations." (*Id.*) Mrs. Minto sought the second opinion of Steven Paragioudakis, M.D. ("Dr. Paragioudakis") of the Center on October 13, 2014. (R. at 0035.) At a first examination appointment on October 13, 2014,[2] Dr. Paragioudakis noted that Mrs. Minto was experiencing left shoulder and arm pain with weakness (R. at 0035), and he initially diagnosed her with pseudarthrosis with instability at C6–7 causing severe neck pain (R. at 0038). He ordered an x-ray, CAT scan, and MRI. (R. at 0037–38.) Following these imaging studies, at a pre-operation appointment on October 29, 2014, Dr. Paragioudakis concluded that Mrs. Minto had "psuedoarthrosis and adjacent level degeneration" and that she would "undergo an anterior cervical revision with removal of hardware at C4–6 and instrumented fusion at C3–4, C6–7." (R. at 0050–51.)

The Center sought approval for the hospital stay from Care Allies, which sent a letter approving the medical necessity only for the length of stay for the procedure scheduled for October 31, 2014. (R. at 0017, 0019.) The letter and an accompanying email from Ms. Theresa Doll expressly emphasized that, "whether or not expenses for your hospital stay and any related expenses will be covered, can only be determined by your health plan. This notice is not a guarantee of payment." (R. at 0019.) Dr. Paragioudakis performed Mrs. Minto's surgery on October 31, 2014 with the "absolutely necessary" assistance of Marc S. Menkowitz, M.D. ("Dr. Menkowitz). (R. at 0053.) Dr. Paragioudakis composed an operative report that documented

---

[2] Relevant to the pursuit of this claim for benefits and the presentation of this lawsuit, Mrs. Minto also legally assigned her benefits of coverage to the Center and designated it as her authorized representative at this first appointment. (R. at 0080.)

3

pseudarthrosis. (R. at 0053–55.) In a post-operation appointment and review on December 19, 2014, Mrs. Minto expressed that she was "extremely satisfied with the surgical outcome," had no complaints of numbness or weakness, and no longer needed prescription pain medication. (R. at 0065.)

On February 4, 2015, NALC acknowledged the insurance claims submitted by the Center for Drs. Paragioudakis and Menkowitz for $172,837 and $169,090, respectively. (R. at 0338–40.) NALC contracted Maximus Federal Services, Inc. ("Maximus") to review the claim and determine whether the surgery was medically necessary to treat Mrs. Minto's condition, thereby warranting coverage under the Plan. (R. at 0147.) Maximus is an independent review service that has an independent board-certified orthopedic surgeon—with no affiliation to Maximus, the providers, patient, or NALC—review claims and claim appeals. (R. at 0148.) On February 25, 2015, Maximus sent NALC a completed audit report concluding that the procedure was medically unnecessary (R. at 0147–48), having found no evidence of pseudarthrosis within the information and documentation provided and thus no need for revision surgery: "[T]here were no medical records provided prior to surgery or from follow-up services. Therefore, there is no information pertaining to the enrollee's history other than the listed pre-operative diagnosis." (R. at 0150.) NALC received this report on March 3, 2015 (R. at 0141), and on March 11 and 13, 2015, NALC sent letters to the Doctors with these results and its decision that the procedure was not medically necessary under the Plan (R. at 0086–89). On March 16, 2015, Connie, the billing manager at the Center, called asking for an explanation as to the denial, and NALC representatives indicated that she could submit additional documentation in support of the claim for Mrs. Minto's procedure. (R. at 0141.) On March 30, 2015, consistent with its denial of

4

coverage, NALC sent letters to various care providers associated with the surgery noting overpayments of insurance.[3] (R. at 0352–61.)

On April 18, 2015, the Center appealed to NALC's Special Investigation Unit, with additional documentation, including the CAT scan and MRI report, and Dr. Paragioudakis's post-operative report; NALC sent these materials to Maximus on May 21, 2015 for a second independent review. (R. at 0091, 0362, 0412.) On June 26, 2015, Maximus sent a new report to NALC concluding that the surgery was not medically necessary for Mrs. Minto's condition. (R. at 0172–73.) Maximus's reviewer cited peer research and articles for this conclusion, discussing that motion analysis is a better indication of pseudarthrosis than CT scans because it is less subjective and more predictive than imaging studies that fail to detect gross motion across fusion sites—as the radiographic report failed to do in this case. (R. at 0175.) On July 13, 2015, NALC issued a letter with these results confirming its initial denial of coverage. (R. at 0028, 0143.) The letter also informed Mrs. Minto of her right to appeal NALC's decision to OPM. (R. at 0029.)

On October 6, 2015, Dr. Paragioudakis submitted a letter attesting to the medical necessity of the procedure on Mrs. Minto's behalf, alleging that no less than three doctors confirmed a finding of pseudarthrosis. (R. at 0062.) On October 9, 2015, Maggs & McDermott, LLC, on behalf of Mrs. Minto and Drs. Paragioudakis and Menkowitz, appealed NALC's decision to OPM. (R. at 0463.) The appeal enumerated eight pieces of evidence that allegedly demonstrated why NALC's conclusion to deny coverage was flawed. (R. at 0464.) Thereafter,

---

[3] NALC also sent letters to North American Partners in Anesthesiology, Intraoperative Monitoring Professionals, Biomedicon, Inc., and Monmouth Medical Center (R. at 0352–61) who provided services and submitted claims related to Mrs. Minto's procedure. Because the procedure itself was not medically necessary nor were these associated services, and any insurance coverage already paid was considered overpayment. (*See, e.g.*, R. at 0358.)

5

Mrs. Minto cancelled her NALC coverage in December 2015, effective December 31, 2015. (R. at 0144.) On December 29, 2015, OPM requested an explanation from NALC and a copy of NALC's complete file. (R. at 0144.) OPM then sought an advisory opinion from an independent medical reviewer,[4] and received a Medical Review Analysis Report on January 22, 2016. (R. at 0453.) The report considered two questions: (1) whether the October 31, 2014 procedure was medically necessary, and (2) whether the CPT codes for the procedure were properly documented. (R. at 0454.) The report noted that there is a lack of quality literature and evidence finding surgery appropriate for the type of pain Mrs. Minto experienced, and that there was no correlation between her physical exam findings or her CT scan with the dermatomal pattern of pain in her upper extremities. (R. at 0456–57.) OPM issued its final opinion letter on January 29, 2016, upholding NALC's repeated finding that the procedure was not medically necessary under the terms of the Plan because there was no clear documentation of pseudarthrosis. (R. at 0001–02.)

On October 12, 2016, Mrs. Minto and the Center filed the present lawsuit against Defendant, appealing OPM's final decision. (*See generally* ECF No. 1.) Amended complaints were filed on June 9 and August 10, 2017 (ECF Nos. 17, 21), and on October 13, 2017, Defendant moved for summary judgment (ECF No. 22). Plaintiffs opposed and cross-moved for summary judgment. (ECF No. 24.) Each party filed responsive briefs. (ECF Nos. 27, 28.) These Cross Motions are presently before the Court.

---

[4] OPM contracted IMEDICS to conduct this review and compose the medical report discussed herein. (Thompson Decl. ¶¶ 2–3, ECF No. 27-1.) This report is found in the record (R. at 0453–57), but another copy, without redaction of the reviewing doctor's name, was provided by defendants (*see generally* ECF No. 27-2).

## LEGAL STANDARD

The appeal of an agency decision under the Administrative Procedure Act ("APA") is reviewed by courts pursuant to § 706 of the APA. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013). "It provides that we shall 'hold unlawful and set aside agency action, findings and conclusions' that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)); *see also CBS Corp. v. FCC*, 663 F.3d 122, 137 (3d Cir. 2011); *Smith v. U.S. Office of Pers. Mgmt.*, 80 F. Supp. 3d 575, 580 (E.D. Pa. 2014). "The scope of review under the 'arbitrary and capricious' standard is 'narrow, and a court is not to substitute its judgment for that of the agency.'" *CBS Corp.*, 663 F.3d at 137 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)); *Wynne v. U.S. Office of Pers. Mgmt.*, 2016 WL 3046254, at *2 (D.N.J. May 27, 2016).

Sitting as an appellate court employing this deferential and narrow standard of review, the district court must consider if the agency's decision is supported by the record, *Elfeky v. Johnson*, 232 F. Supp. 3d 695, 706 (E.D. Pa. 2017), such that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Christ the King Manor, Inc.*, 730 F.3d at 305 (quoting *Motor Vehicle Mrfs. Ass'n of U.S., Inc.*, 463 U.S. at 43) (alterations in original). "[I]n an action to recover on a claim for health benefits under the FEHB program, the reviewing court '[w]ill be limited to the record that was before OPM when it rendered its decision affirming the carrier's denial of benefits.'" *Wynne*, 2016 WL 3046254, at *2 (citing 5 C.F.R. § 890.107(d)(3)). But where this record does not support the agency's decision or the agency failed to consider all factors, "the proper course, except in rare

7

circumstances, is to remand to the agency for additional investigation or explanation." *Id.* (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

Plaintiffs filed the instant law suit appealing and seeking review of OPM's finding that Mrs. Minto's procedure was not medically necessary under the terms of her NALC and FEHB insurance coverage. Accordingly, the arbitrary and capricious standard controls. *See Colicchio v. Office of Pers. Mgmt.*, 2011 WL 382403, at *4 (D. Md. Feb. 3, 2011) ("A court reviews OPM actions under [the Federal Employees Health Benefits Act] pursuant to the Administrative Procedures Act . . . ."); *see also id.* at *5 ("*[D]e novo* review of an OPM decision on medical necessity is inappropriate."). While summary judgment is the mechanism as a matter of law for reviewing an agency decision, *Dworjan v. United States*, 2014 WL 12600259, at *3 (D.N.J. Apr. 30, 2014) (citing *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 693 (3d Cir. 1999)), the APA standard controls and Rule 56 does not apply, *Soni v. United States*, 2016 WL 4154137, at *2 (D.N.J. Aug. 2, 2016); *Penn. Dep't of Human Servs. v. U.S. Dep't of Health & Human Servs.*, 241 F. Supp. 3d 506, 511 (E.D. Pa. 2017); *Elfeky*, 232 F. Supp. 3d at 706. Therefore, the following analysis is limited to that standard and based on the administrative record. Federal Rule of Civil Procedure 56 and corresponding Local Civil Rule 56.1 statements of material fact not in dispute are not employed.

## ANALYSIS

Defendant moves for summary judgment on the basis that OPM's decision was "rational and based on the relevant records," "easily satisf[ying] this highly deferential standard of review." (Def.'s Mot. Summ. J. at 18.) Plaintiffs cross-move on the basis that this decision was

in fact arbitrary and capricious because it ignored key medical evidence. (Pls.' Opp'n & Cross Mot. Summ. J. [Pls.' Cross Mot.] at 6, ECF No. 24-1.)[5]

Giving a great deal of respect and deference to OPM's "substantial specialized knowledge regarding medical practice and procedure," courts are not inclined to disturb coverage decisions. *Colicchio*, 2011 WL 382403, at *5 (internal citations omitted). OPM decisions have been upheld where the record reflects agreement among multiple doctors that a procedure was not medically necessary, *id.* at *6, or where a determination of medical necessity was made upon a full review of the record and medical literature or peer reviewed publications, *Gordon v. Office of Pers. Mgmt.*, 2010 WL 4449374, at *5 (D. Md. Nov. 5, 2010). Disagreement in the analysis of an issue or condition between a plaintiff's supporting doctors and defendant's reviewing doctors "is not sufficient for [a] court to conclude that OPM's decision was arbitrary or capricious." *Id.* Even where a treating doctor recommended a particular procedure, OPM's denial of coverage is not necessarily arbitrary or capricious where the doctors "did not point to any clinical evidence documenting that [a procedure] would be a preferred or medically appropriate method for managing [a condition]." *Campbell v. U.S. Office of Pers. Mgmt.*, 384 F. Supp. 2d 951, 957 (W.D. Va. 2004). On the other hand, one court has found an OPM decision to be arbitrary and capricious where OPM "failed to consider all relevant

---

[5] Plaintiffs also argue, unavailingly, that Defendant asserts the incorrect standard for this Motion, and that instead "OPM's decision is arbitrary if the medical opinion it relied on to render its final decision is determined to be arbitrary." (Pls.' Cross Mot. at 5.) While this is true, Plaintiffs ignore the fact that OPM had the entire factual record on which to base its decision. And OPM has a great deal of breadth regarding how and on what basis it may consider an appeal. *See* 5 C.F.R. § 890.105(e). Accordingly, all of the information contained in the record is relevant to its determination. Likewise, it is not true that "the Court must consider only OPM's final agency action and the basis therefore." (Pls.' Cross Mot. at 5–6.) On the contrary, as explored in the legal standard above, although limited in its scope of review, the court may *and should* look to the entirety of the administrative record. *See Wynne*, 2016 WL 3046254, at *2 (citing 5 C.F.R. § 890.107(d)(3)).

9

evidence" on appeal due to poor documentation. *Surgicore v. Office of Pers. Mgmt.*, 2006 WL 733548, at *8–9 (N.D. Ill. Mar. 21, 2006).

Plaintiffs argue that OPM ignored much of the information presented to it on appeal. (Pls.' Cross Mot. at 7 n.2.) Specifically, Plaintiffs claim that OPM ignored: "1) Dr. Main's opinion that his surgery had failed, 2) the several imaging studies confirming the absence of any bridging bone between C6 and C7, and, 3) Dr. Paragioudakis's first-hand visual confirmation on the operating table." (*Id.* at 8.) Plaintiffs also claim that OPM's reviewer failed to consider important aspects of Mrs. Minto's condition—notably, radiating pain through the upper extremities. (*Id.* at 7; Pls.' Sur-Reply at 4–5, ECF No. 28.)

Plaintiffs' reliance on this information is misplaced. First, the record provides no express statement by Dr. Main that his fusion procedure failed. (*See* Def.'s Reply at 6–7, ECF No. 27 (noting Dr. Paragioudakis's certification misstates the record).) Accepting Plaintiffs' claim that it did fail because it did not result in the fusion Dr. Main intended to achieve with an allograft (R. at 0058–60 (describing the last procedure as an allograft implant and reconstruction to unite the C6 and C7 vertebrae)), Dr. Main did not conclude that Mrs. Minto suffered from pseudarthrosis. Instead, he described her condition as "probable pseudarthrosis" but did not recommend any surgery or procedure as treatment, only advising that Mrs. Minto have an MRI and refrain from strenuous activity. (R. at 0031.)

Second, while Plaintiff alleges that the x-ray, CAT scan, and MRI all confirm the absence of growth and loss of disc space between the C6–7 vertebrae, and thus pseudarthrosis (*compare* Pls.' Cross Mot. at 4, *with* Def.'s Mot. Summ. J. at 5), the Court is not persuaded. Dr. Tejas Shinde did not mention pseudarthrosis at all in his comments on the CAT scan and x-ray reports, nor did Dr. Stanley Lu on the MRI. Dr. Shinde reviewed both the CAT scan on October 16,

10

2014 at Shrewsbury Diagnostic Imaging and the x-ray at October 27, 2014 at Lenox Hill that Dr. Paragioudakis ordered. (*See* R. at 0040, 0044.) According to the CAT scan report, Mrs. Minto had "multilevel disc desiccation," "loss of disc height and osteophyte formation, worst at C6–7," and "osteophyte . . . with bilateral facet hypertrophy," resulting in narrowing between the C6 and C7 vertebrae. (R. at 0040.) While part of the record, but not an initial observation, the Court notes that an addendum was dictated and added to the CAT scan report on October 8, 2015—almost one year after the original scan, report, and review—noting "findings are suspicious for pseudarthrosis at C6–C7." (R. at 0042.) According to the x-ray report, there was a loss of disc height and osteophyte formation, worst again at the C6–7 passage. (R. at 0044.) Dr. Stanley Lu reviewed the MRI[6] report on October 28, 2014 at St. Barnabus, noting disc osteophyte and hypertrophy stenosis. (R. at 0046.) These reports all share observations of osteophyte (bone spur growths) (Def.'s Mot. Summ. J. at 5 n.4) or hypertrophy. They make no mention of the specific condition of pseudarthrosis, a false joint forming between the vertebrae nonunion. (Def.'s Mot. Summ. J. at 4 n.3.)[7] This point is convincing for two reasons. From the Court's perspective, it seems that these conditions apparently share the features of unnatural growth and/or narrowing between vertebrae. They are, however, clearly distinct medical conditions of which reviewing Drs. Shinde and Lu were likely aware when they made their specific observations and chose the particular language in their reports. Moreover, the absence of any mention of pseudarthrosis in these reports demonstrates that the medical record and

---

[6] The record includes documentation that the MRI was approved by MedSolutions, noting that the requested service was medically necessary, but the approval letter noted that it was not a guarantee of payment of benefits for which the enrollee is not eligible. (R. at 0221.)

[7] This definition is corroborated by case law found throughout the federal system, in district and circuit courts, as well as the Court of Appeals for Veterans Claims. *See, e.g., Baez v. Comm'r of Soc. Sec.*, 657 F. App'x 864, 866 n.4 (11th Cir. 2016); *Hanabarger v. Sec'y of Health & Human Servs.*, 1989 WL 197434, at *2 n.3 (N.D. Ill. Nov. 22, 1989); *Kirtdoll v. McDonald*, 2016 WL 808675, at *3 n.1 (Vet. App. Mar. 2, 2016).

11

documentation neither negates nor contradicts the conclusions of the medical reviewers in this case. *See Clauss v. Geisinger Health Plan*, 196 F. Supp. 3d 463, 473 (M.D. Pa. 2016) (finding decision arbitrary and capricious under ERISA where multiple reviewers' opinions ignored the plaintiff's medical records and history), *appeal filed*, Civ. No. 16-3427 (3d Cir. Aug. 22, 2016).

Third, Dr. Paragioudakis's observation of the condition on the operating table was after he elected to conduct the surgery, and though relevant, is but one opinion not verified or supported by that of other physicians. Finally, fourth, the Court is satisfied that OPM's reviewer took Mrs. Minto's pain into consideration. Plaintiffs rely on the reviewer's comment that "[s]urgical care for axial neck pain alone is not recommended." (R. at 0456; *cf.* Pls.' Cross Mot. at 7 ("Yet OPM's final decision . . . refers to Ms. Minto's symptoms as axial neck pain alone.").) As Defendant observes, Dr. Paragioudakis's original examination and pre-operation examination report documents Mrs. Minto's complaints of "left shoulder and arm pain with weakness" (R. at 0035), but his own notes reflect "full and painless" motion through both upper extremities—shoulder through wrist (R. at 0036, 0049; Def.'s Reply at 7). Even so, the reviewer who composed OPM's Medical Review Analysis Report made specific mention of Mrs. Minto's pain: "Pain is noted in the left shoulder and arm with weakness. This impacts her activities of daily living. She has undergone physical therapy and interventional pain management without relief. Radiographs disclose severe pain with attempted neck range of motion." (R. at 0455.) Thus, Plaintiffs' claim that the OPM reviewer ignored evidence of Mrs. Minto's pain is inapposite (Pls.' Sur-Reply at 5), and it is not self-evident that "OPM did not understand, let alone appreciate, the facts before it" (Pls.' Cross Mot. at 7).

12

In response, Defendant argues that this motion practice amounts to the fact that Dr. Paragioudakis[8] "disagrees with the two board-certified doctors who reviewed the records for NALC and OPM." (Def.'s Reply at 4.) At first blush, the Court notes that the Maximus reviewers employed by NALC were well-educated, actively practicing, board-certified orthopedic surgeons, versed in the technicalities of conditions such as Mrs. Minto's, specializing or holding fellowships in spinal surgery. (*See* R. at 0149, 0178; *see also* R. at 0455 (OPM reviewer also board-certified orthopedic M.D.).) With respect to Defendant's argument, the Court is persuaded by Defendant's reliance on *Jon N. v. Blue Cross Blue Shield of Massachusetts*, 684 F. Supp. 2d 190 (D. Mass. 2010), for the argument that Dr. Paragioudakis's assessment was a diagnosis, and "there is a difference between a diagnosis by a treating physician and a determination that the treatment in question was medically necessary." (Def.'s Reply at 8.) The nuances on which Plaintiffs rely, such as the breadth of Mrs. Minto's pain and her sensation versus pain in the personal examination (*see, e.g.*, Pls.' Sur-Reply at 5) emphasize the nuances involved in diagnosis and treatment. *See Jon N.*, 684 F. Supp. 2d at 203. Undoubtedly, "a *diagnosis* by a treating physician is likely to be more reliable than one provided by a reviewing physician." *Id.* (emphasis in original). Review of a claim for benefits, however, is not based on such nuances derived from a physical exam but the application of "a standardized and narrowly defined list of qualifying criteria to the participant's particular set of symptoms, as

---

[8] In support of Plaintiffs' Cross Motion for Summary Judgment, Dr. Paragioudakis submitted a Certification (ECF No. 24-2) as to his account and perspective of Mrs. Minto's condition. Plaintiffs assert that this is "submitted only to explain technical terms of complex subject matter involved in the agency action." (Pls.' Cross Mot. Summ. J. at 3 n.1 (citing *NVE, Inc. v. Dep't Health & Human Servs.*, 2004 WL 5561798, at *4 (D.N.J. Aug. 4, 2004)).) The Court need not explore the validity of this certification, because it finds the OPM record exceedingly complete and there is adequate information in federal case law to corroborate the essential medical terminology. *Supra* note 9. Therefore, the Court is not in need of additional information or support on which to base this Opinion.

documented by treating physicians in the participant's medical records"—therefore a treating physician's opinion should be given no special weight. *Id.*; *see also Campbell*, 384 F. Supp. 2d at 957 (finding decision not arbitrary and capricious where OPM elected not to rely on the recommendation of treating doctors). This view is consistent with the language of the Plan itself, which expressly qualifies that the fact that a provider recommended or prescribed a particular treatment, procedure, medication, etc., does not itself indicate or guarantee that said service will be deemed medically necessary under the Plan. (R. at 0140; Def.'s Mot. Summ. J. at 21.)

On balance, with due regard given to these arguments, OPM's decision was neither arbitrary nor capricious. There is no indication that OPM ignored any parts of the record or acted arbitrarily in its consideration of the detailed documentation provided on appeal. Rather, OPM's decision makes for three repeated, consistent conclusions that the revision surgery performed by Dr. Paragioudakis was not medically necessary and thus need not be covered under the terms of the Plan. (R. at 0070.) *See Hurst v. Siemens Corp. Grp. Ins.*, 43 F. Supp. 3d 714, 731 (E.D. Pa. 2014) (finding denial of medical coverage under ERISA was not arbitrary or capricious where each appeal and level of review was accompanied by a new independent review, referencing medical evidence). Moreover, the decision of medical necessity remained unchanged even where the independent reviewer at each stage was afforded additional documentation and materials. (*See* R. at 0069 (noting there were no medical records, pre- or post-op, when NALC conducted its first review and decision).) *See also Colicchio*, 2011 WL 382403, at *4, *6; *Gordon*, 2010 WL 4449374, at *5.

The Court has sympathy for Mrs. Minto's condition and appreciates that she states that she experiences relief since the surgery. But without more, this cannot justify remand. *See Campbell*, 384 F. Supp. 2d at 357 ("There mere fact that [the plaintiff's condition] might have

14

benefited from the abdominoplasty does not necessitate a finding that it was medically 'appropriate' . . . ."). It is not for the Court to make decisions of medical necessity, let alone medical appropriateness, based on its own impression of the facts. *See CBS Corp.*, 663 F.3d at 137. To accept Plaintiffs' assertion that "none of [the prior] treatment worked because only a revision surgery was capable of repairing her condition" (Pls.' Sur-Reply at 6) is a supposition not supported by the conclusions of three independent medical professionals within the administrative record. As discussed in detail above, the record lacks clear documentation of psuedarthrosis, demonstrates that the literature does not support diagnosis of such through the means employed by Dr. Pargioudakis, and evidences disagreement among treating and reviewing physicians as to whether Mrs. Minto suffered from pseudarthrosis. Considering this information contained in the record, the Court finds that OPM made a decision that was adequately and fairly supported by the record.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is granted and Plaintiffs' Cross Motion for Summary Judgment is denied. An accompanying Order will follow.

Date: 1/19/18

ANNE E. THOMPSON, U.S.D.J.

15